**McCARTHY WELL COMPANY, INC.,**
petitioner, Appellant,

v.

**ST. PETER CREAMERY, INC.,**
Respondent.

No. C6–85–1740.

Supreme Court of Minnesota.

Aug. 7, 1987.

Michael A. Nekich, Robert P. Thavis, Minneapolis, for appellant.

Willis Gustafson, Michael K. Riley, St. Peter, for respondent.

## OPINION

SCOTT, Justice.

The appellant, McCarthy Well Company, Inc., was hired by St. Peter Creamery, Inc., to restore the creamery's artesian well to its original capacity. Because McCarthy Well was not paid in full, it brought suit against the creamery seeking to recover $23,422.02 plus interest for work done on the well pursuant to the parties' agreement. The creamery asserted counterclaims, alleging that McCarthy Well negligently performed the work, resulting in damage to the creamery's dried milk products. A jury found that both McCarthy Well and the creamery were negligent as to the work done on the well, that the creamery had suffered $190,000 in damages, and that McCarthy Well was 75% at fault. On appeal from the trial court's judgment and order denying McCarthy Well's motion for a new trial, the Minnesota Court of Appeals held that the *Superwood* doctrine did not preclude the recovery of economic losses resulting from the negligent performance of services; that because an exculpatory clause in the McCarthy Well-St. Peter Creamery contract was unconscionable and invalid, the trial court had properly excluded McCarthy Well's contractual defense; that the trial court's voir dire of jurors did not constitute prejudicial error; and that ·the creamery's late disclosure of an expert witness and certain acts of negligence did

not constitute unfair surprise and that the trial court did not abuse its discretion in allowing the creamery to proceed. *McCarthy Well Co. v. St. Peter Creamery, Inc.*, 389 N.W.2d 514 (Minn.Ct.App.1986). We affirm in part and reverse in part.

In June 1979, shortly after McCarthy Well had made a free inspection of the creamery's artesian well, the creamery's general manager wrote McCarthy Well asking if it had a method of restoring the well to its original capacity. In August 1979, McCarthy Well sent the creamery an acknowledgment-of-order form, and it began on-site work two weeks later.

At the creamery, McCarthy Well pulled a copper liner out of the well casing and airlifted sand out of the bottom of the well. Because airlifting did not result in an increased flow of water, McCarthy Well televised the well and, after an unsuccessful attempt to remove a donut from the well casing, exploded dynamite at the bottom of the well; dynamiting increased the flow of water. About one month later, in late October, McCarthy Well installed a new turbine pump in the well.

In November 1979, McCarthy Well billed the creamery for $34,573.27; the bill included a charge of $8,329.45 for the new pump. The creamery made only a partial payment and McCarthy Well commenced suit on March 12, 1980, to recover the balance. On March 15, 1980, the pump's shaft broke and was not repaired until March 25. In late March the creamery answered and counterclaimed for negligence and misrepresentation of the amount of time the job would take. The pump shaft broke again in April and was repaired by McCarthy Well. In June 1980, McCarthy Well submitted a $4,369 bill to the creamery for the March and April repairs; because the pump was under warranty, the Creamery was billed only for labor expenses. The pump shaft broke again in August, but the creamery did not contact McCarthy Well; instead it hired another company to install a new pump. In January 1981, the new pump broke; televising revealed a hole in the well casing and, in July, 1981, the creamery had a new well dug and installed a new pump.

The two most important issues in this case are: (1) whether the rule enunciated in *Superwood Corp. v. Siempelkamp Corp.*, 311 N.W.2d 159 (Minn.1981), applies so as to bar the creamery from recovering economic losses under a negligence theory; and (2) whether an exculpatory clause in the contract was enforceable. Two other issues are also raised: (3) whether the trial court's voir dire of jurors concerning their affiliation with McCarthy Well's insurer constituted prejudicial error; and (4) whether it was error to allow the creamery to proceed at trial under acts of negligence disclosed only five days prior to trial, and to allow the creamery to use an expert witness disclosed only five days prior to trial.

1. The jury found that McCarthy Well was negligent with respect to the work it performed at the creamery and that its negligence caused 75% of the $190,000 in damages suffered by the creamery. McCarthy Well argues that the *Superwood* doctrine bars the creamery from recovering, under a negligence theory, economic losses arising out of a commercial transaction.

■ In *Superwood Corp. v. Siempelkamp Corp.*, 311 N.W.2d 159, 162 (Minn. 1981), we stated that "economic losses that arise out of commercial transactions, except those involving personal injury or damage to other property, are not recoverable under the tort theories of negligence or strict products liability." Although we did not define "commercial transaction," a review of our decision in *Superwood* shows that, as used in *Superwood*, a "commercial transaction" is a transaction governed by Article 2 of the Uniform Commercial Code, Minn.Stat. ch. 336 (1986).

The *Superwood* rule is premised on the existence of certain rights and remedies provided for in the U.C.C.: "The U.C.C. clarifies the rights and remedies of parties to commercial transactions * * *. To allow tort liability in commercial transactions would totally emasculate [the warranty and liability] provisions of the U.C.C." *Super-*

*wood,* 311 N.W.2d at 162. The rationale behind the *Superwood* rule is that a recognition of tort actions in cases under the U.C.C. would upset the remedies contained in the U.C.C.; when the rationale is not applicable, *i.e.,* when the U.C.C. does not apply, there is no reason for the *Superwood* rule to apply.

Accordingly, we hold that "commercial transaction," as that phrase is used in *Superwood,* means a transaction governed by the U.C.C. When the U.C.C. does not apply, the transaction is not a "commercial transaction," and the *Superwood* rule does not apply.

■ This holding necessarily leads to the next inquiry; namely, whether the McCarthy Well-St. Peter Creamery transaction is governed by Article 2 of the U.C.C. Our recent decision in *Valley Farmers' Elevator v. Lindsay Brothers Co.,* 398 N.W.2d 553 (Minn.1987), addressed the question of "whether and under what circumstances a hybrid contract involving the sale of goods and the provision of services falls within the statutory scheme of the U.C.C." *Id.* at 555. We adopted the "predominant factor" test, discussed in *Bonebrake v. Cox,* 499 F.2d 951, 960 (8th Cir.1974), as the means for determining the proper characterization of a hybrid contract—if the predominant purpose of the contract is the sale of goods, then the U.C.C. governs; if the predominant purpose of the contract is the rendition of services, then the U.C.C. does not govern.

■ We conclude that the predominant purpose of the McCarthy Well-St. Peter Creamery contract was the provision of services. The creamery hired McCarthy Well to restore the creamery's artesian well to its original capacity. Toward this end, McCarthy Well pulled a liner out of the well casing, airlifted sand out of the well, televised the well, attempted to remove a donut from the well casing, exploded dynamite at the bottom of the well, and installed a new pump.[1] After installing the pump, McCarthy Well billed the creamery

$34,573.27; of this amount, only $8,329.45 is identified as the cost of the new pump.

Because we conclude that the predominant factor of the McCarthy Well-St. Peter Creamery agreement was the performance of services, the U.C.C. does not apply. Accordingly, the transaction between the parties was not a "commercial transaction," as that phrase is used in *Superwood.* Thus, the *Superwood* rule does not bar the creamery from recovering, under a negligence theory, its economic losses.

2. After being contacted by the creamery, McCarthy Well sent an acknowledgment-of-order form to the creamery. The reverse side of the form contained an extensive listing of terms and conditions, one of which provided that the "contractor shall not be liable for * * * Any other damage or liability of any nature whatsoever arising or growing out of the Contractor's work hereunder." The trial court excluded the reverse side of the form, including the exculpatory clause, on the ground that it was illegible. The court of appeals upheld the trial court's decision on the grounds that, because of its placement in the contract, the exculpatory clause was unconscionable and/or that the exculpatory clause was invalid because it was not limited to liability for acts of negligence.

■ While the court of appeals held alternatively that the exculpatory clause was invalid because it was not limited in its scope, we do not reach this issue. We find it sufficient for our purpose to invalidate the clause because it is unreadable.

In this case the trial court excluded the contract exculpatory provisions not because of the language used, but because they were illegible. We prefer to say unreadable. On the reverse side of McCarthy's one-page order form (a sheet 11 inches by 8½ inches), appear the contractual terms and conditions proposed by McCarthy for the customer's acceptance. These terms, arranged in a two-column format, are, to say the least, comprehensive and

---

1. We conclude that the purchase and installation of the pump was not a separate transaction. This was a single agreement, executed over an

extended period of time, of which the pump was but one part.

cover the entire page, leaving no room for amendments. If a customer wished to negotiate, it would be difficult to know where or how to begin. What is fatal, however, is that the terms are printed on dark paper in tiny print (what appears to be about 3-point type),[2] with no highlighting of the various sections and subsections as to their contents. The exculpatory section appears in the middle of this impenetrable text. To read the terms and conditions with any degree of comprehension is difficult, exceedingly tedious, and even physically painful. *See DeLancey v. Insurance Co.*, 52 N.H. 581, 588 (1873) (Doe, C.J.) ("Seldom has the art of typography been so successfully diverted from the diffusion of knowledge to the suppression of it.")

This is not a case of unconscionability, as that concept is usually understood, nor do we characterize the exculpatory clause as unconscionable. This is not a case where contract terms are explicit but have unduly harsh or overreaching · consequences. Rather, this is a case where a party is not able to know what the contract terms are because they are unreadable. As a matter of law, the exculpatory clause will not be enforced.

3. With respect to the trial court's voir dire of jurors concerning their possible affiliation with McCarthy Well's insurer, we find that the trial court did not abuse its discretion. During voir dire of the jury, the trial court asked the jurors: "Are any of you interested in any manner, either as employees or agents or stockholders or policy holders in the Great American Insurance Company? Does that ring a bell with any of you?" There was no response from any members of the panel.

Rule 31, Part I, of the Code of Rules for District Courts permits the trial court or counsel to ask the jurors collectively "whether any of them have any interest as policyholders, stockholders, officers, agents or otherwise" in an interested insurance company. The proper scope of such an inquiry lies within the discretion of the trial court. *See Viou v. Brooks-Scanlon Lumber Co.*, 99 Minn. 97, 109–110, 108 N.W. 891, 896 (1906).

■ In this case, where the record does not show why the trial court questioned jurors concerning a possible relationship between any juror and the Great American Insurance Company, and where the court's inquiry consisted of a single question and did not identify Great American as being the insurer of McCarthy Well, we hold that the trial court did not abuse its discretion.

4. In its "answers to interrogatories," dated December 1, 1980, the creamery identified the alleged negligent acts of McCarthy Well to be the negligent use of equipment in performing the job and in installing a defective pipe and pump; the creamery also answered that it had not secured an expert witness for trial. On January 3, 1985, the creamery's attorney notified McCarthy Well's attorney by letter that the creamery intended to call two expert witnesses, Joel Schaefer and Glen Anderson. On the same day, the creamery filed an "amendment to answers to interrogatories" in which it identified the alleged negligence of McCarthy Well to be:

1. Failure to run a plumb line on the well casing before installation of the pump.
2. Failure to inspect cashing [sic] after blasting.
3. The amount of dynamite used was excessive and unreasonable under all circumstances.
4. Installation of an improper type of pump.
5. Installation of a defective pump.

The trial court denied McCarthy Well's motion to exclude evidence as to the alleged negligent acts identified in the amendment to answers to interrogatories; also, the trial court allowed Joel Schaefer to be called as an expert witness, but it prohibited the

---

**2.** Three-point type is about half the size of print in the classified ad section of a newspaper, and for many people would require use of a magnifying glass. This court, in fact, resorted to photo-enlargement in its efforts to decipher this unreadable text. Looking at the contract, one suspects that the contract had originally been printed in larger type and the size then reduced to fit on one page.

creamery from calling Glen Anderson as an expert witness.

The court of appeals upheld the trial court's order, holding that the identification of additional acts of negligence did not "inject an element of surprise into the trial," *McCarthy Well*, 389 N.W.2d at 519, and that McCarthy Well was not prejudiced by the decision to allow Schafer to testify as an expert witness. We affirm.

 A party on whom interrogatories are served has a continuing duty to supplement answers; when a party fails to disclose information acquired after answering interrogatories, drastic sanctions are proper only when it appears that the failure will result in prejudice to the party asserting the violation. *Gebhard v. Niedzwiecki*, 265 Minn. 471, 478, 122 N.W.2d 110, 115 (1963). One of the purposes of interrogatories is to prevent unjust surprise and prejudice, and the purpose of imposing sanctions is to prevent a party who fails to comply with Minn.R.Civ.P. 33 from profiting from his or her own wrong. The proper relief lies within the discretion of the trial court. *Cf. Shymanski v. Nash*, 312 Minn. 304, 308, 251 N.W.2d 854, 857 (1977).

Under the facts of this case, the creamery's identification of additional acts of negligence did not constitute unfair surprise, and the trial court's decision to allow the creamery to proceed at trial under these acts of negligence did not prejudice McCarthy Well. Each act identified as negligent in the creamery's amended answers had been explored during depositions of some of the trial witnesses; the record discloses that McCarthy Well was aware of the bases upon which the creamery alleged negligence, and the performance of McCarthy Well's attorney at trial reveals that no prejudice resulted from the trial court's decision.

The decision with respect to allowing expert testimony is vested in the trial court's discretion. *Cornfeldt v. Tongen*, 262 N.W.2d 684, 697 (Minn.1977).

The general rule in Minnesota is expert testimony should be suppressed for failure to make a timely disclosure of the expert's identity only where "counsel's dereliction [in failing to make the disclosure] is inexcusable and results in disadvantage to his [or her] opponent." * * * The crucial question is whether [the other side] has been prejudiced to any appreciable degree by the late disclosure.

*Dennie v. Metropolitan Medical Center*, 387 N.W.2d 401, 405 (Minn.1986) (citations omitted).

In this case, McCarthy Well was not prejudiced by the creamery's late disclosure of Schaefer as an expert witness. Schaefer had been deposed as a fact witness by McCarthy Well. The content of Schaefer's trial testimony had been explored during the deposition, and the late disclosure does not appear to have impeded the cross-examination of Schaefer by McCarthy Well's attorney.

Affirmed in part; reversed in part.